UNITED STATES of America,
Appellee–Cross–Appellant,

v.

Frank James SKELLY and Craig
Gross, Defendants–Appellants–
Cross–Appellees.

Docket Nos. 05–4261(L), 05–4290(CON),
05–4933–CR–XAP, 05–4936–CR–
XAP, 05–5275–CR(CON).

United States Court of Appeals,
Second Circuit.

Argued: Jan. 17, 2006.

Decided: March 21, 2006.

Joshua Klein, Assistant United States Attorney, New York, New York (Michael J. Garcia, United States Attorney for the Southern District of New York, Rhonda L. Jung, Special Assistant United States Attorney, Raymond J. Lohier, Jr., Katherine Polk Failla, Assistant United States Attorneys, New York, New York, on the brief), for Appellee–Cross–Appellant.

Miguel A. Estrada, Washington, D.C. (David Debold, Washington, D.C., on the brief), for Defendant–Appellant Frank James Skelly.

Stephen P. Scaring, Garden City, New York, for Defendant–Appellant–Cross–Appellee Craig Gross.

Before: NEWMAN and KATZMANN, Circuit Judges, and RAKOFF, District Judge.*

RAKOFF, District Judge.

Frank James Skelly and Craig Gross appeal their convictions of three counts of securities fraud and one count of conspiracy to commit securities fraud and wire fraud. The appeal is from the September 16, 2005, and September 19, 2005, amended judgments of the District Court for the Southern District of New York, Richard M. Berman, District Judge. The primary theory of the prosecution was that Skelly and Gross, as principals of Walsh Manning Securities, Inc. and Walsh Manning Securities, LLC (collectively, "Walsh Manning"), a registered broker/dealer, engaged in what is commonly called a "pump and dump" scheme: they used manipulative techniques to artificially inflate ("pump") the price of certain thinly-traded securities in which they held a substantial interest, and then used fraudulent and high-pressure tactics to unload ("dump") the securities on unsuspecting customers.

This theory was amply supported by the evidence presented at trial. However, at one point in his closing argument the prosecutor offered an alternative theory of liability. Referring to the fact that Walsh Manning paid its registered representatives ("brokers") far more if they sold the manipulated securities ("house stocks") than if they sold other securities, the prosecutor told the jury that:

---

* The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

Every time a broker called a customer up and recommended a house stock and gave the customer a whole bunch of reasons why the customer should buy that stock, but concealed the part about the huge commissions the broker was getting for recommending that stock and selling that stock, that's a fraud under the securities laws. This happened scores, if not hundreds of times every day at Walsh Manning. And as Judge Berman, I expect, will instruct you, in order to find that omission is material, you need only find that the information would have been important to a reasonable investor.

Further to this theory, the district court then instructed the jury that an intentional failure to disclose a material fact could give rise to liability for securities fraud if the broker had a fiduciary duty to disclose the information. Taken together, the prosecutor's argument and the court's instruction meant that the jury could convict the defendants if it found that the defendants intentionally caused the brokers to breach a fiduciary duty to disclose to their customers the heightened compensation the brokers were receiving for promoting the house stocks.

 Of the several points now raised by the defendants on appeal, the most colorable is their claim that the prosecutor's above-quoted argument, when coupled with the district court's instruction, led the jury to convict the defendants on an unlawful theory. Tracing back to the common law principle of *caveat emptor*, it is a fundamental tenet of Anglo–American commercial law that neither a seller nor a middleman has an obligation to disclose his

financial incentives for selling a particular commodity. While the federal securities laws provide the Securities and Exchange Commission with the power to override this principle by promulgating rules that require specific disclosures, and while, pursuant to such rules, a broker/dealer like Walsh Manning must disclose to its customers the remuneration it receives for executing their trades, *see* Rule 10b–10, 17 C.F.R. § 240.10b–10, no SEC rule requires the registered representatives who deal with the customers to disclose their own compensation, whether pegged to a particular trade or otherwise. *See United States v. Alvarado*, No. 01 Cr. 156, 2001 WL 1631396, at *4, 2001 U.S. Dist. LEXIS 21100, at *27–28 (S.D.N.Y. Dec. 19, 2001).

 Here, moreover, the indictment only charged violations of the general anti-fraud provisions of the securities laws and rules (such as Rule 10b–5) and the comparable provisions of the wire fraud statute. *See* 18 U.S.C. §§ 1343, 1346. Under those provisions, a seller or middleman may be liable for fraud if he lies to the purchaser or tells him misleading half-truths, but not if he simply fails to disclose information that he is under no obligation to reveal. Because a registered representative is under no inherent duty to reveal his compensation, otherwise truthful statements made by him about the merits of a particular investment are not transformed into misleading "half-truths" simply by the broker's failure to reveal that he is receiving added compensation for promoting a particular investment.[1]

 Recognizing these basic principles, the able district court made clear to the

---

**1.** The instant case is not controlled by *United States v. Szur*, 289 F.3d 200 (2d Cir.2002), where this Court upheld a wire fraud conviction for non-disclosure that substantial sums from customers' payments were paid to the firm selling the shares and its brokers. The conviction in *Szur* was premised on a "depri-

vation of honest services" theory of wire fraud, *see* 18 U.S.C. § 1343 as modified by 18 U.S.C. § 1346. While the conspiracy count in the present case did include wire fraud as one of its objects, the district court did not include in its charge to the jury the "honest services" prong of wire fraud—under which there is no

jury that it could only convict a defendant on a "failure to disclose" theory if the broker had assumed a "fiduciary duty" to disclose such information. This instruction was consistent with our prior holdings that while "there is no general fiduciary duty inherent in an ordinary broker/customer relationship," *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir.1998), "a relationship of trust and confidence does exist between a broker and a customer with respect to those matters that have been entrusted to the broker," *United States v. Szur*, 289 F.3d 200, 211 (2d Cir.2002). Most commonly, this relationship exists in situations in which a broker has discretionary authority over the customer's account, *see, e.g., Indep. Order of Foresters*, 157 F.3d at 940; *Press v. Chem. Inv. Servs. Corp.*, 988 F.Supp. 375, 386–87 (S.D.N.Y. 1997), but we have recognized that particular factual circumstances may serve to create a fiduciary duty between a broker and his customer even in the absence of a discretionary account. *See, e.g., De Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1306–08 (2d Cir.2002). *See generally United States v. Chestman*, 947 F.2d 551, 568–69 (2d Cir.1991) (en banc) (describing the elements of a fiduciary duty or its "functional equivalent").

■ At the same time, a fiduciary obligation is not to be lightly implied, lest it undercut the basic principles of commercial law described above. To label some-

one a fiduciary is to impose on that person obligations additional, and often contrary, to the ordinary allocations of responsibility that govern commercial transactions. Before the rigors of the criminal law may be imposed, the broker in question should reasonably be on notice that he has entered into a relationship with his customer that gives him heightened responsibilities.

Here, as mentioned, the district court charged the jury that it could convict on a pure "failure to disclose" theory only if the Government proved beyond a reasonable doubt that there was a "fiduciary relationship between the party with knowledge of the material fact at issue and the party without such knowledge." However, even though the Government—drawing on the jury charge we approved in *Szur*, 289 F.3d at 210, which in turn tracked the language of our decision in *Chestman*, 947 F.2d at 568–69—asked the district court to explain in some detail the circumstances under which a broker, or his principal, might have a fiduciary duty to disclose his compensation to his customer in the circumstances of this case, the district court, for reasons unclear from the record,[2] limited the instruction on this point to a single sentence: "One acts in a fiduciary capacity when the business which he transacts or the money or property which he handles is not his or for his own benefit, but is for the benefit of another person as to who[m] he stands in relation implied[3] and necessitating great confidence and trust on the one part, and a high degree of good faith on the other part."

fiduciary duty requirement, *see id.* at 209 n. 5—but rather expressly premised "failure to disclose" liability on a finding of a fiduciary duty. Similarly, *United States v. Santoro*, 302 F.3d 76 (2d Cir.2002), on which the Government also seeks to rely, concerned whether the defendant there abused a "position of trust" under the Sentencing Guidelines when "nothing in the guidelines requires that the position be a fiduciary one." *Id.* at 80. Thus,

neither *Szur* nor *Santoro* is dispositive of the instant case.

2. Regretfully, the charging conference in this case occurred "off the record."

3. The charge language approved in *Chestman* uses the word "implying" rather than "implied." *See Chestman*, 947 F.2d at 568–69. Possibly, the word "implied" in the record here is an error in transcription.

■ This charge omitted the elements of "reliance and de facto control and dominance," which are required to establish a fiduciary relationship. *See Szur*, 289 F.3d at 210. But no better instruction was requested by either defendant, and the only objection raised to the fiduciary duty charge given by the court was that the only evidence that could have supported such a finding should not have been admitted.[4] The defendants therefore failed to raise a specific objection to the omission of the necessary "reliance and de facto control and dominance" language from the charge, and thereby forfeited it. Fed. R.Crim.P. 30(d).

■ Thus, we may not reverse for failure to give a more adequate instruction on fiduciary duty in this context unless the failure constitutes "plain error." Fed. R.Crim.P. 52(b); *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *United States v. Gore*, 154 F.3d 34, 47 (2d Cir.1998). "[I]n most cases [this] means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734, 113 S.Ct. 1770. Here, we think it obvious that there was no such prejudice. The Government's primary theory of liability—that the defendants engineered a pump-and-dump scheme—occupied the entirety of its opening statement and all but a few remarks in its closing arguments. This primary theory was supported by overwhelming proof, including testimony from both insider and outsider witnesses and extensive documentary evidence presented over the course of three weeks.

This is not a case, then, where it is impossible to determine which of two competing theories formed the basis for conviction, for it is overwhelmingly likely that any reasonable juror would have convicted on the basis of the Government's primary theory. Accordingly, we conclude that the otherwise forfeited error in the district court's instruction does not constitute plain error that we may notice.

■ The defendants' other arguments, though numerous, deserve only brief discussion. First, the defendants argue that the Government's alternative theory of liability constituted a "constructive amendment" of the indictment. But, quite aside from our conclusion that the jury did not adopt this theory, the indictment charged the defendants with, among other things, "causing retail brokers employed by Walsh Manning and other firms to employ a variety of fraudulent and illegal sales practices in order to induce customers to buy the securities." While the particular practice of paying the brokers substantially enhanced compensation to "push" the house stocks was not specified, this general language was more than sufficient to encompass it, as well as to put the defendants on fair notice that all their practices used to promote the house stocks were included in the charge. *See, e.g., United States v. Wallace*, 59 F.3d 333, 337 (2d Cir.1995); *United States v. Clemente*, 22 F.3d 477, 482 (2d Cir.1994).

■ Second, the defendants argue that the district court erred in denying their motion for a new trial after it was discovered that the Government's expert witness failed to timely disclose certain

---

4. To whatever extent an objection based on lack of evidentiary support to show a fiduciary duty was well taken and adequately preserved, the evidence in support of the pump-and-dump scheme is presumed to be the basis on which the jury convicted. *See Griffin v. United States*, 502 U.S. 46, 56–57, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (interpreting *Turner v. United States*, 396 U.S. 398, 420, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), to uphold a general jury verdict "if the evidence is sufficient with respect to any one of the acts charged" (internal quotation marks omitted)).

notes he had used to prepare his summary chart—notes that, if known to the defendants when the witness testified, might have been used to impeach the accuracy of the chart (which purported to show that the defendants profited at their customers' expense). However, the district court determined that the Government did not know of the file's existence until after the conclusion of the trial. Although the Government must "learn of any favorable evidence known to . . . others acting on the government's behalf in the case," *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), that duty does not extend to the knowledge of an ordinary expert witness who was not involved with the investigation of the case, *see United States v. Stewart,* 433 F.3d 273, 298–99 (2d Cir.2006). Thus, this evidence would require a new trial only if the defendants could show that its disclosure would probably have resulted in an acquittal. Given the overwhelming evidence presented at trial, there is no basis for concluding that the district court abused its discretion in determining that it would not.

▆▆▆ Third, defendant Gross argues that the evidence presented at trial was insufficient to support his conviction on the four counts. The Court reviews a challenge to the sufficiency of the evidence *de novo* and will affirm if, viewing all the evidence in the light most favorable to the Government, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Jones,* 393 F.3d 107, 111 (2d Cir.2004). Given the overwhelming evidence of a pump-and-dump scheme and the ample evidence of Gross's involvement in that scheme, we conclude that the jury could easily have determined that Gross was guilty of the charged counts.

▆▆▆ Fourth, Gross argues that the Government denied him a fair trial by using unsubstantiated opinion testimony and improper propensity testimony. For example, at one point, in response to a proper question, a cooperating co-conspirator testified that Gross "was aware of what was going on with the stocks." But in context this was simply a summary of the witness' more particularized testimony as to Gross' involvement in the conspiracy. Similarly, while Gross complains that the district court improperly admitted two witnesses' testimony as to their understanding of the meaning of various statements Gross made in the course of conversations with them, both witnesses had first-hand knowledge of the conversations and their testimony may have aided the jury's understanding of those conversations. Fed. R.Evid. 701; *see also United States v. Urlacher,* 979 F.2d 935, 939 (2d Cir.1992). More generally, as to each and all of Gross' evidentiary objections of this kind, even if the challenged testimony had not been admitted, the conversations themselves, taken in conjunction with the other evidence of Gross' involvement in the "pump-and-dump" scheme, provide ample evidence of Gross' involvement in the charged offenses. Thus, the admission of the challenged testimony did not have a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *United States v. Dukagjini,* 326 F.3d 45, 61–62 (2d Cir.2003) (quoting *United States v. Castro,* 813 F.2d 571, 577 (2d Cir.1987)).[5]

▆▆▆ Fifth, Gross argues that the Government should have conferred immunity on James Shanley, Walsh Manning's chief compliance officer. As a general rule, the Government need not confer immunity for the defense's benefit. *United States v. Dolah,* 245 F.3d 98, 105 (2d Cir.2001), *ab-*

---

**5.** Likewise, the defendant's challenges to the prosecutor's statements on summation although likely without substantive merit,

would not, in any event, require reversal because none of the prosecutor's allegedly improper statements resulted in "substantial

*rogated on other grounds by Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The Government is required to provide this immunity, or not immunize its own witnesses, only when the Government "has engaged in discriminatory use of immunity to gain a tactical advantage or, through its own overreaching, has forced the witness to invoke the Fifth Amendment; and ... the witness' testimony will be material, exculpatory and not cumulative and ... is not obtainable from any other source." *Id.* There is no evidence that these "special circumstances" obtain here, and thus the Government was not obligated to confer immunity on Shanley.

We have considered all of the defendants' other objections and find them without merit. Accordingly, for the foregoing reasons, we affirm the convictions of Frank James Skelly and Craig Gross on all counts.

prejudice" to Gross. *See, e.g., United States v.* *Bautista,* 23 F.3d 726, 732 (2d Cir.1994).